**Mr. Kevin E. Thomas**

**6711 W. Osborn RD #162**

**Phoenix, AZ**

**85033**

**(602) 486-5364**



# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

**Kevin E. Thomas**

**Plaintiff**                                                    **case #**   CV-16-02886-PHX-ESW

**V**

**ALLY BANK**

**OCWEN LOAN SERVICING LLC**

**CENLAR CENTRAL lOAN ADMIN. & REPORTING**

**AND**

**MALCOLM CISNEROS**

**Nathan F. Smith**

**KEVIN HAHN**

**A Law Corporation**

1

**Defendants**

## COMPLAINT

**BREACH OF CONTRACT/GOOD FAITH AND FAIR DEALING**

**WRONGFUL FORECLOSURE**

**FRAUDULENT MISREPRESENTATION**

***VIOLATIONS OF THE HOME OWNERS BILL OF RIGHTS Act of 2014 and THE NEW SERVICIING RULES*** **and the Dodd-Frank Wall Street Reform Consumer Protection Act**

**LACK OF STANDING**

**BREACH OF THE DEED OF TRUST**

**PROMISSORY ESTOPPEL**

**DUAL TRACKING**

**ROBO SIGNING**

**NEGLIGENT CONCEALMENT**

**R.I.C.O.**

**VIOLATION OF A.R.S 44-1522**

**VIOLATION OF A.R.S 33-420**

**FRAUDULENT CONCEALMENT**

2

**OF**                                                                    **NEGLIGENT INFLICTION**
                                                                          **EMOTIONAL DISTRESS**

                                        **QUIET TITLE**
                                        **UNJUST ENRICHMENT**


**This Court has Proper Jurisdiction pursuant to U.S.C. 2605 and the Real Estate Settlement Procedures Act of 1974 and Jurisdiction is also proper pursuant to 12 CFR 1024 SubPart C**

**INTRODUCTION:**

Plaintiff's Case is based on the abusive acts and practices committed by All defendants who have totally disregarded the new federal rules that were implemented through the Home Owners Bill of Rights Act of 2014 and enforced by the CFPB that are to be followed by loan servicers while servicing a federally related Loan.

The CFPB is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act which protects consumers from unfair, deceptive, or abusive acts or practices by mortgage servicers – whether they are a bank or nonbank. State financial regulators, state attorneys general, and the CFPB uncovered substantial evidence that Ocwen violated state laws and the Dodd-Frank Act.

In early 2012, examinations by the Multistate Mortgage Committee, which is comprised of state financial regulators, identified potential violations at Ocwen. In addition, the Federal Trade Commission teferred its investigation of Ocwen to the CFPB after the Bureau opened in July 2011. The Bureau then teamed with state attorneys general and state regulators to investigate and resolve the issues identified. The settlement was a multi-jurisdictional collaborative effort that the State of Arizona took part in.

In 2012, OCWEN purchase ResCaps/GMAC servicing portfolios when ResCap/GMAC declared chapter 11 Bankruptcy and liquidated all of their Mortgage Servicing Assets "Asset Purchase Agreement" to OCWEN that subjected OCWEN to ResCap/GMAC Consent Judgment Order as their Successor. ResCap agreed to ensure the continued performance of the obligations under the Consent Judgment, including, without limitation, the Consumer Relief Activities and in the case of a purchase or other acquisition of assets, to honor and perform the obligations with respect to those assets); ResCap also agreed to  ensure the continued performance of their obligations

under the Consent Judgment, including requiring any **successor or purchaser of substantially all the assets (or assets that together are material to the performance of the obligations of the ResCap Parties under a Consent Judgment**)

The CFPB and its partner states which includes Arizona, believe that Ocwen was engaged in significant and systemic misconduct that occurred at every stage of the mortgage servicing process. According to the complaint filed in the federal district court in the District of Columbia, Ocwen's violations of consumer financial protections put thousands of people across the country at risk of losing their homes. Specifically, OCWEN and its Sub Servicer CENLAR FSB have completely ignored the complaint and have continued to engage in deceptive practices towards plaintiffs loan.

**OCWEN, ALLY Bank, CENLAR and their Attorneys has failed plaintiff in the servicing of his loan and has totally disregarded not only the new federal servicing rules but they have also ignored the ALLY/GMAC and the OCWEN Federal Consent Orders in the following counts:**

**COUNT 1**

**FRAUDULENT CONCEALMENT**

**ALL DEFENDANTS**

**1. All** Defendants named in this lawsuit, OCWEN, CENLAR, ALLY Bank, MTC Financial and their "Attorneys", knew or should of known but  fraudulently concealed the fact that Plaintiff Kevin Thomas and not April Thomas has owned  the subject property since 1996 and that the purported loan applied for by plaintiff was for a **"Cash Out Equity Refinance Loan"** for Kevin Thomas and not a "Purchase Money Loan" for his daughter April Thomas but continued to enforce the loan while knowing that the loan was fraudulent and void. see  *Am Jur 2d. @ section 8 and A.R.S. § 44-1991 aid and abet Geiler, 24 Ariz. App. at 267-68 & 270-71, 537 P.2d at 995-96 & 998-99*

a. fraud vitiates every transaction and contract.

b. fraud destroys the validity of everything into which it enters and that it vitiates the most solemn contracts, documents and even judgments and see Geiler, 24 Ariz. App. at 267-68 & 270-71, 537 P.2d at 995-96 & 998-99 securities fraud

**2.** All defendants had access to the loan file and were aware or should of been aware that in March of 2008, the Home Loan Network (who are on the deed of trust as lender), only brokered the transaction and did not loan plaintiffs daughter April Thomas

4

(who is on the deed of trust as trustor) any money for the aquisition of plaintiff's property located at 6711 W. Osborn Road #162 Phoenix, Arizona 85033

**3. All** defendants had access to the loan file and knew or should of known that during the loans origination, the loan docs were illegally altered from a refinance loan for Kevin Thomas to a purchase money loan for plaintiff's daughter April Thomas where it was that the equity was stripped from Kevin Thomas's property during the loan's origination South West Securities FSB paid off Kevin Thomas's loan in the amount of $81000 and created a note in daughter April Thomas's name for $94,100 which is a difference of $13000 never paid to plaintiff Kevin Thomas as the alleged "Seller" of the property.

**4. ALL** defendants knew or should have known that the note in the amount $94100 in daughter April's name was then sold to fannie mae who bundled and securitize the loan with other loans and the loans were then sold to investors as mortgage backed securities "MBS" but have used fraudulent securitization schemes in the manufactoring of fraudulent documents to show beneficial interest in plaintiff's property. (see initial Loan Application that show "refinance" and also see Kevin Thomas's Full Reconveyance of deed of trust that show that Kevin Thomas's deed of trust was paid off and his deed was reconveyed back to him for his benefit and not for April Thomas's benefit) see *Am Jur 2d. @ section 8 and Arizona Securities Act ("ASA") A.R.S. § 44-1991 aid and abet  See Davis, 123 Ariz. at 331, 599 P.2d at 784*

**3. ALL** Defendants knew or should of known but fraudulently concealed the fact that each of them had full knowledge that the purported loan was rescinded in 2010 by April Thomas and each defendant knew or should have known that April Thomas discharged the purported loan to clear it from her credit profile in 2014.

4. All Defendants knew or should have known by having access to the loan file, that a Police Report (in loan file) was filed in 2010 by Plaintiff Kevin Thomas alleging fraud, equity theft and identity theft but each defendant failed to investigate/reinvestigate and only covered up the fraud by changing loan servicers without notice in violation of Arizona Securities Act ("ASA") aid and abet and violation of ResCap Consent Order. see Pg. A-32 and see OCWEN Consent Order Loss Mitigation Requirements A-17 #4 also see *see Arizona Securities Act ("ASA") aid and abet*

**4. ALL** Defendants fraudulently concealed that the puported loan was not funded by GMAC Mortgage Company LLC as indicated on the copy of an altered note that was sent to plaintiff from ALLY Bank on December 2, 2015, and knew or should have known that

GMAC only serviced the loan for fannie mae (owner/investor) up until GMAC's 2012 bankruptcy where it was that the mortgage note was discharged as bad debt owed to fannie mae but each defendant failed to disclose that fact while pretending to enforce the discharged bad debt as collectors for GMAC as though GMAC is a current investor/owner of the Mortgage Note.

**5.** ALL defendants knew or should have known that the note produced by CENLAR was fraudulently back dated and was digitally endorsed in blank by GMAC, CENLAR, ALLY Bank, attorneys for ALLY Bank, MTC Financial or OCWEN to plaintiff's detriment and that such acts violate *18 USC Code @ 473-474 Dealing in counterfeit obligations of securities and such act also violates the* OCWEN and ALLY/ResCap Consent Orders. see Pg. A-8 of OCWEN Consent Order  "Documentation of Note" and see:  Geiler, 24 Ariz. App. at 267-68 & 270-71, 537 P.2d at 995-96 & 998-99

**6. ALL** Defendants fraudulently concealed that the purported loan was brokered and originated by the Home Loan Network and that S.W. Securities secretely financed the payoff of plaintiff's loan inorder to still plaintiff's equity from said property but all defendants have engaged in fraud by making claims that the loan became an ALLY Bank Proprietary Loan after the purported loan was discharged by GMAC in 2012 and discharged by daughter April Thomas in August of 2014.

**7. All** Defendants fraudulently concealed that GMAC LLC could not have endorsed the note dated March 25, 2008 produced by ALLY Bank and CENLAR  as proof of ALLY Bank's ownership/beneficiary status to foreclose on plaintiff on January 19, 2016.

**8. ALL** defendants knew or should have known that GMAC LLC did not receive an assignment from MERS until June of 2012 which is four years after the date of the alleged note and knew or should of known that the note was altered and could not be a copy of the original.

---

**ATTORNEY MISCONDUCT**

**ER 8.4. Misconduct**

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or

(f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable Code of Judicial Conduct or other law.

(g) file a notice of change of judge under Rule 10.2, Arizona Rules of Criminal Procedure, for an improper purpose, such as obtaining a trial delay or other circumstances enumerated in Rule 10.2(b).

1. The attorneys for ALLY Bank claimed to have held an auction that was not in compliance with ARS chapter 33 notice requirements but instead held a mock auction that was in violation of ARS 44-1218 Fraudulent or mock auction; classification; forfeiture of license and disqualification of auctioneer.

A. A person who obtains money or property from another, or obtains the signature of another to a written instrument, the false making of which would be forgery, by means of a false or fraudulent sale of property or pretended property by auction, or by any practice known as a mock auction, is guilty of a class 6 felony.

B. A person convicted of a violation of subsection A of this section shall forfeit his license as auctioneer, and shall be forever disqualified from receiving a license to act as auctioneer.

1. ALLY Bank's Attorneys Malcolm Cisneros Nathan F. Smith and Kevin Hahn a (LAW CORPORATION) herein "attorneys for ALLY BANK" knew or should of known that ALLY Bank were not the Holder or the Holder in due coarse of an alleged mortgage note to plaintiffs property but did continue to assist ALLY Bank in an obvious fraudulent attempt to still plaintiff's home and did violate the above section of attorney misconduct and plaintiff is demanding that they are sanctioned accordingly and that damages be awarded to plaintiff for negligent infliction of emotional distress. see demands below

2. The attorneys for ALLY Bank knew or should have known that, to use MTC Financial as a Substitution of Trustee for their alleged foreclosure was a fraudulent act because only a **Beneficiary of a trust** can substitute a **trustee of a trust** and ALLY Bank are not

the beneficiary of a trust to plaintiff's property but are claiming to have purchased plaintiff's property at an unscheduled, unannounced alleged auction on January 19, 2016.

3. The attorneys for ALLY Bank committed fraud by producing a trustee's deed that says, "ALLY Bank paid $42,300.00 in **"CASH" in lawful money of the United States"** that gives the clear indicatation that ALLY Bank was in the capacity of a purchaser at an auction but yet, under **sworn oath**, the so-called substitution trustee used the exemption code of ARS 11-1134 (b) that says, option 1."Solely in order to provide or release security for a debt or obligation or option 2. including a trustee's deed pursuant to power of sale under a deed of trust" if option 2 was executed, the attorneys are admitted to using option two (2) but has failed to produce into evidence a copy of a certified cashiers check that show proof of purchase under the laws of evidence or the attorneys are admitting to committing fraud by using option 1. because ALLY Bank is not named as the beneficiary of the deed of trust and ALLY Banks's corporate assignment is nullity and thereby ALLY Bank was not entitled to use option 1 to release security for a debt or obligation that ALLY Bank is not owed which is fraud because you cant have it both ways under the laws of this state.

**3.** As officer's of the court, the attorney's for ALLY Bank has failed the judicial system by not verifying that ALLY Bank had a legitamate interest in plaintiff's property before initiating any foreclosure action and thereby violated ER 8.4 (a)(b)(c)(d)(e)(f)(g).

**4.** The attorneys for ALLY Bank knew or should have known that ALLY Banks "Corporate Assignment" from GMAC and OCWEN's "Limited Power of Attorney" was void, groundless and meritless but commenced a foreclosure and UD action base on those documents and has sworn under the laws of perjury (affidavit) that they have verified the information in their complaint to be true while all the time knowing that the information was false and thereby, have committed professional misconduct per ER 8.4 (a),(b),(c),(d),(e)(f) and plaintiff is demanding damages and sanctions against each of attorney involved.

---

## SUBSTITUTE TRUSTEE LIABILITY

ALLY Bank's Substitution Trustee should be sanctioned for its engagment in this fraudulent transfer of plaintiff's property to ALLY Bank and ALLY Bank Trustee Deed should be declared groundless, for because of foreclosure fraud and the transaction lacked  consideration and has therefore violated ARS 44-1218 Fraudulent or mock

auction; classification; forfeiture of license and disqualification of auctioneer.

**7.** MTC Financial knew or should have known that ALLY Bank was not on the recorded deed of trust and that ALLY Bank's fraudulently recorded Corporate Assignment from GMAC did not put ALLY Bank in the chain of title because GMAC LLC had been disolved and defunct for over three years when the assignment to Ally Bank was made and any assignment from GMAC would be untimely and NULL and void. MTC Financial knowingly continued to engage in the fraud for financial gain in violation of ARS 1522 and ARS 44-1218 to plaintiff's detriment and plaintiff is demanding statutory damages and actual damages to be determined by this court.

---

**8. ALL** Defendants fraudulently concealed that GMAC's assignment from MERS dated June of 2012 was not valid because the Purported Trust had already been closed since December 1st, of 2008 and any assignment to the Trust subsequent to the date of

**9.** All defendants  fraudulently concealed that the purported loan was not originated by GMAC/ResCap as alleged by defendants and that the loan was never assigned/sold to GMAC/ResCap by third party originator S.W. Securities or fannie mae who purchased the loan in 2008 and that such acts violates the OCWEN/ ResCap Consent Orders. see Pg. A-8 **Documentation of Note, Holder Status and Chain of Assignment.**  defendant's conduct also violates ARS  44-1211

**10. All** Defendants fraudulently concealed that the purported loan was once modified through the United States Treasury Department's HAMP Program by OCWEN in 2013 under loan number 0602004677 but is now being serviced by OCWEN's Sub-Servicer CENLAR under the ficticious Loan Number of 0057564270 as an ALLY Bank Proprietary Loan  in violation of ResCap Consent Order. see Pg. A-8 **Documentation of Note, Holder Status and Chain of Assignment** and see OCWEN Consent ORDER **Loss Mitigation Requirements Pg. A-17 #4  and see 44-1211 fraudulent conveyance**

11. **ALL** Defendants knew that ALLY/GMAC serviced the purported loan from March of 2008 under loan number 0602004677 from April of 2008 until around November of 2012 and OCWEN serviced the loan from around November of 2012 until about August of 2014 under the same loan number of 0602004677 and now OCWEN has claimed to have never serviced the loan at any time under that loan number once it had been changed to the fraudulent loan number of 0057564270 in 2014 and serviced by CENLAR.

12. OCWEN has also claimed that the name, social security number, **property** address and the loan number associated with the  loan number of (0602004677) **does** not show up in their system or records because OCWEN fraudulently conveyed **the** purported loan to ALLY Bank to plaintiff's detriment in violation of A.R.S. 44-1211

 13. **ALL** Defendants knew or should have known that the purported loan was not sold/assigned to GMAC by The Home Loan Network who are fraudulently on the Deed of Trust and the **altered** Mortgage Note as the "Lender" but continued to engage in dishonesty by ignoring the truth of that fact and colluded with each other to rob plaintiff of his property rights with the use of fraudulent documents. see  *Am Jur 2d. @ section 8  and see 44-1211 fraudulent conveyance and see* **UCC 3-407 below**

(a) "Alteration" means (i) an **unauthorized change** in an instrument that purports to modify in -any respect the obligation of a party, or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party.

(b) Except as provided in subsection (c), **an alteration fraudulently made discharges a party** whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration. No other alteration discharges a party, and the instrument may be enforced according to its original terms.

 14. Defendants CENLAR, OCWEN and ALLY Bank fraudulently concealed the fact that once a fannie mae loan has been modified through HAMP the loan was no longer assumable but each defendant are guilty of deceiving plaintiff into believing otherwise and continued to accept plaintiff's trial period payments and are gilty of trying to induce plaintiff into signing daughter April Thomas's name to an ALLY Bank proprietary permanent modification agreement while all the time knowing that April Thomas discharge the canceled loan and did not reaffirm or apply for a modification .

**15.** All Defendants fraudulently concealed that the loan had once been modified in 2013 into daughter April Thomas' name without verifying her current ownership/occupancy status nor did the permanent modification contain her consent and signature. Defendant OCWEN was negligent in their failing to check the County Records before putting the unauthorized modification in April Thomas's name which would of revealed to them that the deed of trust had been Granted back to Kevin Thomas' name since 2011.  see OCWEN Consent Order that says:

"The borrower shall be converted by Servicer to a permanent modification upon **execution** of the final modification documents, consistent with applicable program

guidelines, absent evidence of "fraud".

**16**. All Defendants did not followed the new servicing rules of 2014 **and** 2016 which deals with transfers of ownership when a verified successor in interest applies for a Loan Mod when Fannie Mae is the Guarantor of the loan per Fannie Mae guidelines F-1-28. also see ALLY Consent Order. **Requirement for Accuracy and Verification of Borrower Account Information Pg. A-4 and Ocwen Consent Order Loss Mitigation Requirements Pg. A-17 #4**

## COUNT 1:  BREACH OF CONTRACT/GOOD FAITH AND FAIR DEALING

**A**. In November of 2009, Plaintiff and his daughter April Thomas got ahold of then servicer of the purported loan GMAC and spoke with their loss mitigation department and told them that the deed of trust was void and rescinded for the following reasons:

1. The deed of trust in daughter April Thomas's name came by way of fraud during its origination.

2. Plaintiff did not intend to convey his property to his daughter April Thomas.

3. There is no recorded sales agreement or riders to any escrow instructions that requires plaintiff Kevin Thomas's consent for the sale of his interest in the property.

4. The deed of trust does not show plaintiff Kevin Thomas as Grantor/Seller and does not show daughter April Thomas as Buyer/Grantee and that the deed of trust is not supported by a recorded or unrecorded sales agreement.

5. The Home Loan Network who are on the deed of trust as "Lender" are not Lenders and did not loan money but are Brokers who did not have a written Agency Agreement from plaintiff Kevin Thomas to convey his interest to anyone and a deed of trust created by the Home Loan Network is illegal and constitutes unauthorized practice of law and fraud.

6. Plaintiff's loan applied for was a "cashout refinance loan" that was only co-signed by daughter April Thomas and not a purchase money loan.

7. The purported loan is void for lack of consideration and frustration of purpose.

## POINTS OF AUTHORITY

Under Arizona's Statute of Frauds, an agreement for "the sale of real property or an interest therein" requires a writing, signed by the parties to be charged. Ariz. Rev. Stat. Ann. § 44-101(6) (West). The writing must contain the terms and conditions of all the promises constituting the contract and by whom and to whom the promises are made. Shreeve, 65 Ariz. at 39, 173 P.2d at 644.

In general, an enforceable contract requires three basic elements: 1) an offer, 2) acceptance, and 3) consideration. Without detailing each component too much, the first two elements are often combined into one affair: mutual consent. "It is elementary that before there can be a binding contract there must be mutual consent of the parties to the terms thereof." Heywood v. Ziol, 91 Ariz. 309, 372 P.2d 200 (1962); see Denbo v. Badger, 18 Ariz. App. 426, 427–28, 503 P.2d 384, 385–86 (Ct. App. 1972) (holding that specific performance was not available to a prospective buyer of real property because there was no mutual consent between the buyer and seller).

Notably, Arizona law construes escrow instructions, supplemental escrow instructions, and even receipts as valid "writings" sufficient to show an agreement between the contracting parties. Dennis Builder, Inc. v. Goff, 101 Ariz. 211, 214, 418 P.2d 367, 370 (1966). Courts do not require a specific format for written agreements; rather, the key is that all of the necessary elements are present. The required elements, which must be shown by clear and convincing evidence, are: "the names of the parties, the description of the land, the purchase price, the time of payment, and the promise to execute and deliver instruments of conveyance." *Id.* (quotation omitted). In short, if all the essential terms of a contract of sale are agreed upon by the parties when they signed the agreement, there will be a valid contract. *Id.*

**B. In May of 2012** Plaintiff was told by GMAC to halt any payments until the fraud was properly investigated and reached to a conclusion and to complete a HAMP Modification Packet and to forward a copy of a police report to their loss mitigation department which plaintiff complied. see Count 1 fraudulent concealment, 1 thru 5

**C.** GMAC/ResCap never replied back on the status of plaintiff's request for the loan Modification/New Workout or the outcome of the fraud investigation

**D.** After numerous unsuccessful phone calls to GMAC's Loss Mitigation Department, it was later discovered that GMAC/ResCap had discharged its debts and Liquidated all of its loan servicing rights to OCWEN through chapter 11 Bankruptcy Liquidation and OCWEN failed to send plaintiff a Change of Servicer Notice as required by USC 2605(b)

**E.** On or about December of 2013, plaintiff received a Mortgage Account Statement from defendant OCWEN without the required change of server as required by USC 2605 (f)

**F.** The Mortgage Account Statement sent by defendant OCWEN, demanded a payment for the amount of $5280.00 for past due payments it also demanded fees/other for the amount of $23,002.70 but ironically no <u>outstanding late charges</u> were due per payment statement.

**G.** Since Plaintiff had never heard back from GMAC/ResCap LLC as mentioned above and had not received a Treasury Modification Agreement applied for in November of 2009, plaintiff knew that there was continued fraud on the purported loan being that he had not received a change of Servicing Notice from defendant OCWEN.

**H.** Plaintiff called the phone number listed on the payment statement from defendant OCWEN and was refered to their Loss Mitigation Department when it was that Plaintiff was told by OCWEN that $23,002.70 demanded was because the Investor had to pay off a HOA Judgment Lien on plaintiff's property.

**I.** Plaintiff explained that all HOA Dues were supposed to be impounded per Deed of Trust Agreement and that they were in breach of the contract and plaintiff also explained that he was not suppose to make any payments on the rescended loan until GMAC concluded their fraud investigation and that the past due amount of $5280 was wrong.

**J.** Plaintiff also demanded proof in writing from OCWEN that they were the servicer/owner of the purported loan after they proved that they had no knowledge of the rescission that should have been in GMAC's file relating to the fraud investigation and the Loan Modification/Workout.

**K.** OCWEN never did send the proof or notice of servicing rights and in May of 2014, daughter April Thomas filed Chapter 7 and discharged the Note/Mortgage Obligation from off of her credit report around August of 2014 and in October of 2014 plaintiff received a Notice of default addressed to April Thomas from CENLAR who also did not send a change of servicer notice required by USC 2605.

**L.** Defendants CENLAR and ALLY Bank claim to have held a foreclosure on plaintiffs principle dwelling on January 19th, 2016 after failing to properly evaluate plaintiff as a successor in interest after they received a **NEW** complete HAMP Modification Packet in January of 2015 and a copy of plaintiff's recorded Deed of Trust that put the property back into Kevin Thomas's name that was recorded in 2011.

**M**. Plaintiff submitted the HAMP Packet in January of 2015 to defendant's alleged Sub

13

Servicer CENRTRAL LOAN ADMINISTRATION & REPORTING, herein "CENLAR".

**N.** Plaintiff submitted a Making Homes Affordable Application, to CENLAR's Loss Mitigation Department more than 37 days before an alleged foreclosure auction that was scheduled for June 4th, of 2015 and it was timely acknowleged . *(Valbuena v. Ocwen Loan Servicing).*

**O**. Plaintiff also submitted a copy of plaintiff's 2011 Recorded Deed of Trust, W2's, Tax Returns, Bank Account Statements, Hardship Letter that explained the fraud and rescission and a copy of a 2010 Police Report filed by plaintiff for the **fraud, equity and identification theft** during the origination of the purported loan as requested by servicer CENLAR who promised to rectify the wrong that GMAC/ResCap and OCWEN had promised.

**P.** Plaintiff made all of his Trial Period Payments *(Wigod v. Wells Fargo Bank)* and was promised a permanent modification/Assumption after it was that plaintiff was verified and confirmed to be a **"Successor in Interest"** to the Deed of Trust but defendants failed to honor plaintiff as successor in interest and knowingly processed the loan modification into April Thomas's name who did not request a loan modification for the rescinded loan discharged in her chapter 7. *see page 2 of the Deed of Trust "Successors in Interest" Sections 18 and 19 of Deed of Trust "Transfer of Property". also see promissory estoppel Colman v. JP Morgan Chase Bank, N.A., CIV. A. 3:14-0183, 2014 WL 1871726 S.D.W. Va. May 8, 2014 and see CFPB Final Rule 2016 "successors in interest"*

**Q**. After plaintiff completed all Trial Period Payments, Defendants knowingly and deceivingly processed all of plaintiff's payments and the Permanent Modification Agreement into a Non Applicant's Name "April Thomas" and did not follow the new servicing rules implemented by CFPB for "successors in interest" nor did they follow Fannie Mae Guidelines for transferring loans once it has been verified that a property has been transfered to a new owner who applied for HAMP. see 12 USC 2605(f) *see Fannie Mae Servicing Guide F-1-28* and **CFPB Rules for Successors in Interest.also see 15 USC 1640(a).**

**R.** It has now been discovered that the loan debt/note was discharged in GMAC's bankruptcy which explains why plaintiff has never received a change of servicer notice from OCWEN, CENLAR nor ALLY Bank but each have fraudulently tryed to continued to enforce the discharged debt through trickery and deceit. This was a fannie mae loan that was assigned to GMAC by MERS Corp. in June of 2012 which is only two months

after GMAC file for chapter 11 and the debt was discharged and paid off.

**S.** The loan/note was copied from electronic records and then altered and digitally endorsed in blank by GMAC made to look like a debt owed to fannie mae (creditor/investor) and then discharged through GMAC's bankruptcy. Ally Bank has now tried to use the same fraudulent instrument to foreclose on plaintiff's property as the beneficiary of this fraudulent scheme.

## COUNT 2

## LACK OF STANDING

**For reasons stated below, all defendants lacked standing to foreclose on plaintiff's principle dwelling:**

**1.** Defendant ALLY Bank is not the beneficiary/lender of a voided and rescinded purported mortgage loan that was procured by Broker Origination Fraud in which no money was loan to plaintiff's daughter for the purchase of plaintiff's property.

**A.** Equity was stolen from plaintiff during its Origination and has never been returned and now ALLY Bank is claiming to be the beneficiary of the rescinded, discharged and voided mortgage loan through the use of a fraudulent Recorded Corporate Assignment and a forged digitally altered mortgage note.

**B.** Defendant ALLY Bank through its attorneys has now claimed to have held a foreclosure auction on January 19th, 2016  through the use of those fraudulent documents in violation of 18 USC @ 473 and 474 and has also failed to comply with ARS 33-807.01, 808, 809. see  *Am Jur 2d. @ section 8 and see  44-1218  Fraudulent or mock auction; classification; forfeiture of license and disqualification of auctioneer*

***Memorandum of Authority***

*44-1218    Fraudulent  or  mock  auction;  classification;  forfeiture  of  license  and disqualification of auctioneer*

*A. A person who obtains money or property from another, or obtains the signature of another to a written instrument, the false making of which would be forgery, by means of a false or fraudulent sale of property or pretended property by auction, or by any practice known as a mock auction, is guilty of a class 6 felony.*

*B. A person convicted of a violation of subsection A of this section shall forfeit his license*

*as auctioneer, and shall be forever disqualified from receiving a license to act as auctioneer.*

---

**3.** The Note produced by defendants to validate beneficiary status, show The Home Loan Network on the face of the instrument as Lender but is not endorsed by the Home Loan Network but is fraudulently <u>endorsed in blank</u> by GMAC which makes it an obvious creature of fraud see fannie mae guidelines for Note Endorsements which requires the entity on the deed of trust and note to endorse the note first in blank before any other endorser subequent .  see UCC 3-407

Memorandum of Authority

(a) "Alteration" means (i) **<u>an unauthorized change</u>** in an <u>instrument</u> that purports to modify in any respect the obligation of a <u>party,</u> or (ii) an unauthorized addition of words or numbers or other change to an <u>incomplete instrument</u> relating to the obligation of a party.

(b) Except as provided in subsection (c), an alteration **fraudulently** made **discharges** a <u>party</u> whose obligation is affected by the alteration unless that party assents or is precluded from asserting the <u>alteration</u>. No other alteration discharges a party, and the <u>instrument</u> may be enforced according to its original terms.

---
‐

**4.** The Home Loan Network who are fraudulently named on the Deed of Trust as Lender, has never loaned plaintiff nor daughter April any money but only **Brokered (bailor)** the purported loan for third party SW Securities FSB (bailee) under loan number 0602004677 and not defendant's loan number of 0057564270 in which ALLY Bank claims to have held a foreclosure on and has now filed a UD action which violates ARS 44-1218

**5.** Both The Home Loan Network and S.W. Securities "vitiated" the contract by engaging in the identity theft, fraud and equity theft during the origination of the voided/canceled loan to plaintiff's detriment.  see *Am Jur 2d. @ section 8*

a. fraud vitiates every transaction and contract.

b. fraud destroys the validity of everything into which it enters and that it vitiates the most solemn contracts, documents and even judgments

16

**6. Di**spite of the fact that the Mortgage Note and the Deed of Trust were procured by fraud and invalid, Ally Bank and its bankrupt entity GMAC/ResCap were not the Holder or Holder in Due Coarse of a Mortgage Note and no consideration was owed to either party.

**7.** Neither party are the owners of plaintiff's home or has loaned money towards the purchase of plaintiff's home but ALLY Bank is claiming an interest through a **fraudulent chain of assignments** beginning with the initial entity (the Home Loan Network) who never loaned money to the transaction followed by GMAC who serviced the loan for fannie mae (investor) who pooled the loan into a securitized trust (MBS) who never had the loan assigned to itself followed by MERS acting as "Nominee" for the Home Loan Network (who are non Lenders/non bank) who assigned to GMAC followed by OCWEN who purchased all of GMAC's servicing rights through bankruptcy court followed by GMAC "corporate assignment" to ALLY Bank three years after GMAC was defunct followed by CENLAR who sub serviced the canceled/voided loan for ALLY followed by ALLY Bank's fabricated Mortgage Note that back dates to 2008 that is suppose to give the illusion that it was endorsed by ALLY/GMAC as the Lender. see UCC 3-407

(a) "Alteration" means (i) an **unauthorized change** in an <u>instrument</u> that purports to modify in any respect the obligation of a <u>party</u>, or (ii) an unauthorized addition of words or numbers or other change to an <u>incomplete instrument</u> relating to the obligation of a party.

(b) Except as provided in subsection (c), an alteration **fraudulently** made discharges a <u>party</u> whose obligation is affected by the alteration unless that party assents or is precluded from asserting the <u>alteration</u>. No other alteration discharges a party, and the <u>instrument</u> may be enforced according to its original terms.

**8.** It is impossibillity for ALLY/GMAC to be the Lender in 2008 when it was that GMAC did not get an assignment of the loan until June 5th, 2012 two months after its filing for chapter 11 bankruptcy on May 14, 2012 and all GMAC assets were auctioned off to OCWEN as the highest bidder and are using the ALLY Bank name as a "straw man".

**9. The Bankruptcy Case Trustee** who was responsible for the management of the property of the GMAC estate during GMAC's chapter 11 bankruptcy **did not sell or assign the purported loan to** AllY Bank/ ALLY Financial before GMAC became defunct in December of 2013 which makes the ALLY Bank's recorded "Corporate Assignment" from OCWEN's recorded limited power of attorney for GMAC to  invalid, NULL and VOID which puts OCWEN and ALLY Bank in violation of ARS 33-420

**10..**<u>A corporation exists separate and apart from its owners, the stockholders</u>. The chapter 11 bankruptcy case of a corporation (corporation as debtor) does not put the personal assets of the stockholders at risk other than the value of their investment in the company's stock. A sole proprietorship (owner as debtor), on the other hand, does not have an

identity separate and distinct from its owner(s). Accordingly, a bankruptcy case involving a sole proprietorship includes both the business and personal assets of the owners-debtors.

**11.** Dispite of the fact that the Mortgage Note and Deed of Trust was void for its fraudulent origination, OCWEN's, "attorney in fact for GMAC" was also null and void because GMAC was already defunct and disolved as an entity as of December of 2013.

**12.** Any interest that GMAC could have possibly had as "Lender" was sold to OCWEN to satisfy GMAC's creditors during their chapter 11 bankruptcy liquidation asset purchase agreement with OCWEN.

**13.** Being that OCWEN is a non lender none bank but are only loan servicers, OCWEN could not pretend to assume the invalid loan as the "Lender" nor could OCWEN have the invalid loan assigned to them as "beneficiary" of the deed of trust without Red Flags which is why OCWEN is using the ALLY "Bank" name as a Straw Man.

**14.** Which clearly explains why OCWEN recorded a "Corporate Assignment" from GMAC to ALLY on January 27, 2015 but by operation of law such a transfer is not Valid three years after GMAC was completley disolved as a corporation. see *Deutsche Bank Nat'l Trust Co. v Burke S.D. Texas 2015* and *Yvanova v. New Centry Mortgage Corporation,S218973(#14-100) and also* see *Am Jur 2d. @ section 8*

**15.** Dispite the fact that the loan was procured by fraud and was invalid, MERS CORP's Assignment to GMAC in 2012, was also NULL and VOID because MERS was only <u>acting</u> as <u>Nominee</u> for The Home Loan Network who never loaned plaintiff any money and who are also a non lenders/non bank but BROKERED the transaction and assisted in the theft of plaintiff's equity from said property.

**16.** Plaintiff applied for a Cash Out Equity Loan in Kevin Thomas' name but loan but was fraudulently converted to a Purchase Money Loan in plaintiff's daughters name which vitiated the contract. see *Am Jur 2d. @ section 8 also see frustration of purpose doctrine*

**17. Dispite the fact that t**he Deed of Trust assigned to GMAC in 2012 was not a "Beneficiary Deed" with Right of Survivorship per A.R.S. 33-405, assigning ALLY beneficiary interest in case of GMAC death "defunct", "disolved which thereby makes ALLY Bank and OCWEN's January 27, 2015 Recorded Corporate Assignment NULL and VOID.

**18.** The alleged foreclosure held by defendants under loan number 0057564270 was a fraudulent made up loan number and not the actual loan number of 0602004677 that OCWEN have claimed to have never serviced but now ALLY Bank claim to have held a foreclosure sale under the fraudulent loan number of 0057564270 without notice to OWNER OF RECORD in violation of ARS 33-809(B)(2) and notice requirements ARS 33-807, 807.01 and ARS 33-808.

**19.** Defendants also failed to comply with the new Servicing Rules of the Home Owners Bill of Rights Act of 2014 that requires a servicer to file a Certification of Determination of Eligibility with the Maricopa County Recorders Office stating that the servicer has determined the eligibility of the mortgagor for an affordable loan modification in compliance with the new servicing rules or any such sale is VOID and no person that purchased the property may initiate an action to recover possession of the property but ALLY Bank has ignored those new provisions and has initiated a UD action towards plaintiff.

**20.** AllY Bank was not a beneficiary to the deed of trust and thereby all indispensable parties (the actual owners) were not before the court or was represented in the foreclosure action and the UD action.

**21.** April Thomas discharged the purported Loan May of 2014 through chapter 7 and did not reaffirm the debt "Mortgage Note" which left the deed of trust (collateral lien) that has been in Kevin Thomas' name since 2011. : see next paragraph

**22.** According to section 11 U.S.C. @ 524(e) of the Bankruptcy Code which states, "Except as provided in subsection (a)(3) of this section, <u>discharge of a debt (Mortgage Note) of the debtor does not affect the liability of any other entity on</u>, <u>or the property of any other entity </u>for, such debt", which thereby requires anyone claiming to have a lien on plaintiff Kevin Thomas's property (Title Holder) to seek a court judgment or a quiet title action.

For reasons stated above, plaintiff avers that defendants lacked any capacity or standing to foreclose on plaintiff's home and defendants forclosure action should be **set aside and invalidated.**

**COUNT 3**

**WRONGFUL FORECLOSURE**

For reasons stated in ALL counts this Wrongful Foreclosure should be set aside.

**COUNT 4:  FRAUDULENT MISREPRESENTATION:**

**1.** In April of 2015, Plaintiff mailed in the Modification and affidavit (RMA), Internal Revenue Service Form 4506-T, Hardship Affidavit, a copy of a Police Report, and plaintiff's Quit Claim Deed as requested by defendant CENLAR.

**2. All** Defendant's agreed to stop any foreclosure action and work with plaintiff on modifying the property from out of daughters name and back into plaintiff's name once they were in receipt of all requested documentation, especially the Police Report filed by plaintiff in 2010 for broker and loan originator fraud. in violation of 44-1522

**3.** Defendant CENLAR/ALLY Bank used fraudulent misrepresentation by deliberately luring plaintiff into making the Trial Period Payments with no intentions of honoring plaintiff as the Successor in Interest for a HAMP permanent loan modification per Fannie Mae Guidelines  F-1-28, the deed of trust and the National Homeowners Bill of rights 2014 which states that successors in interest are eligible as Borrowers for HAMP.

**4.** Defendants knew that the loan had already been fraudulently modifed under HAMP in 2013 by defendant OCWEN Loan Serving who serviced the loan for Fannie Mae and knew that any Modified Fannie Mae HAMP Loans are not Assumable per Fannie Mae Guidelines but continued to assure plaintiff that he would receive a loan modification but processed the loan modification into a non applicant non owner's name and now claim to have held a foreclosure in a non owners name under a fraudulent loan number in violation of 44-1218.

**5.** Defendants fraudulently modified the purported loan in 2013 without the correct property owners knowledge or signature and back dated the unauthorized modification to reflect an April of 2010 date under a fraudulent loan number in violation of ARS 44-1211.

**6.** Plaintiff's daughter did not request a Modification and had already discharged the bad debt (Mortgage Note) May of 2014 and did not reaffirm the debt but defendants fraudulently processed kevin Thomas's Loan Modification Documents and trial period payments into daughter's name towards the discharged Mortgage Note in violation of 44-1522

**7.** When Plaintiff notified defendant's of their obvious fraudulent intent, defendants promised to mail out a new Modification Packet in which plaintiff did received by mail on the same day defendants claim to have held a foreclosure auction on plaintiff's property under a ficticious loan number and on February 26, 2016 started a U.D. action

in April Thomas' name who was a non owner non occupant of the property with the intent to still Kevin Thomas's property rights which violates plaintiffs rights under 44-1218 and 44-1522

**8**. Defendant's tried to deceive plaintiff by adding plaintiff to a Final Modification Agreement in April Thomas' name that she didn't authorize or request, and where plaintiff was to sign it stated "Kevin E. Thomas, signing solely to acknowledge this agreement, but not to incur any personal liability for the debt"

**9**. Which is simular language used in Fannie Mae Supplemental Directive 09-01 and 10-02 for **Borrowers in Bankruptcy** which states "I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the loan documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this agreement". See ResCap-ALLY and OCWEN Consent Orders "Foreclosure and Bankruptcy Information and Documentation"

**10**. Defendant's knew that such language is to be used where April Thomas was to sign and not Kevin Thomas as successor in interest since April Thomas discharged the debt through chapter seven and did not reaffirm. **note:**

A loan modification is not suppose to re-establish liability on a loan that is (or was) discharged in bankruptcy. The modification changes the terms of the loan, but a new loan is not being created, and the debtor is not agreeing to once again take on personal liability for the loan. The only instance where personal liability on a modified loan survives a bankruptcy is if it was reaffirmed during the bankruptcy. Contrast this with a post-bankruptcy mortgage refinance, where (1) an entirely new loan is being created (after bankruptcy), and (2) you would have personal liability on the payment obligation.

**11**. The deceiving language  was an obvious ploy to get plaintiff to get his daughter to sign the agreement which would of caused her to  enter into a refinance agreement for a fraudulent debt under a fraudulent loan number being that she had already discharged the right loan number through her chapter 7 bankruptcy.

**12**. Plaintiff did not sign or return the fraudulent modification and on December 12th, 2015 plaintiff called defendant CENLAR's loss mitigation department and demanded new Mod. Docs and was told by an employee that I was trying to stall a foreclosure they had scheduled for the 19th of January 2016. Plaintiff had not received  a written notice regarding a foreclosure per ALLY Bank ResCap Consent Order of 2011 or OCWEN Consent Order Pg. A-16 #'s 12, 13, ARS 33-807.01 and the new servicing rules of January 10, 2014.

**13.**   Shortly thereafter, plaintiff received a denial letter dated January 5th, 2016 addressed to April Thomas who did not reside with plaintiff nor did she apply for the Modification. The letter stated that April Thomas had communicated to CENLAR that she had declined their offer of a loan mod., while all the time knowing that plaintiff was a **verified successor in interest** requesting the modification and not April.

**14**. Plaintiff demanded to speak with a supervisor who advised plaintiff to fax over another Hardship Letter, Quit Claim Deed, Pay-stubs, and some new Bank Statements in which plaintiff did comply.

**15**. The supervisor also said that a new Mortgage Assistant Form and a new 4506T Form would be mailed out to me and that I would need to sign and fax them within 30 days and that the foreclosure would be postponed and on January 10th, 2016, plaintiff received a letter dated January 6th, 2016 addressed to April Thomas that acknowleged that receiving the faxed requested documents and that plaintiff had 30 days to return the mortgage assistance form and the 4506T form.

**16**. Plaintiff did not received the new Mortgage Assistance Form and the 4506T form by mail until January 19th, 2016 and they arrived in an undated presorted unmarked envelope done deliberately to deceive plaintiff.

**17**. The next day, January 20th, plaintiff faxed over the signed Mortgage Assistance Form and the 4506T Form as instructed and called defendant to confirm that defendant had received them and was told by defendants that plaintiff's home was sold January 19th, 2016.

**18**. During that conversation, plaintiff communicated that he had until the 5th of February (30 days) to have all paperwork turned in and defendant replied that plaintiff did not make the deadline. see letter stating that plaintiff had until February 5th, to have all paperwork turned in. **EXHIBIT**  and also see **EXHIBIT**   letter dated January 5th, 2016 defendants acknowledgement of receiving defendants Modification Package.

**19**. On January 22nd, 2016, plaintiff receive a back dated letter addressed to April Thomas dated January 6th, 2016 stating that April Thomas did not submit the required paperwork in time which made her ineligible for a modification prior to a foreclosure sale date. The letter is dated the same date as the letter that gave 30 days to have all documents turned in which clearly show that defendant is using illegal **dual tracking schemes.**

**20**. After plaintiff received the denial letter addressed to April Thomas, plaintiff called

22

defendant CENLAR and was told that a foreclosure had taken place on January 19th, 2015. Plaintiff replied that he had 30 days for all paperwork to be turned in which he had done per letter marked as EXHIBIT  but was told by defendants representative that a sale of plaintiff's home had already occured and for plaintiff to call back and speak to a supervisor.

**21**. The following day, plaintiff attempted to get ahold of defendant CENLAR loss mitigation supervisor by phone only to discover that defendant CENLAR had put a block on plaintiff's loan number and social security info and the block is still in place to this date.

**22**. Several days later, plaintiff received another letter addressed to April Thomas dated January 26, 2016 containing vague language stating that the letters received by plaintiff that acknowleged CENLAR receiving Modification documents dated January 5, 2016 and and the letter dated January 6, 2016 that gave plaintiff 30 days to have all paperwork sent to them were mailed in error.

**23**. On January 28th, 2016, plaintiff came home from work to find a Notice taped to his door that basically said vacate the premises.

**24.** On February 2nd, 2016 another Notice from a different company was taped to plaintiff's door of the same type as mentioned.

**25.** On February 4th, a five day notice to vacate from defendant ALLY BANK was taped to the door.

For reasons state above, defendant's have engaged in deliberate, wanton, deceptive and fraudulent misrepresentations in the attempted theft of plaintiff's property and has proven total disregarded for any and all law.

## COUNT 4

### PROMISSORY ESTOPPEL

**1.** Defendants promised plaintiff a HAMP Modification after all Trial Period Payments were completed and then used trickery, deceit, malice and unlawful practices in the breaching of the contract. *(Wigod v.Wells Fargo Bank, NA, 673 F3d 547 7th Cir. 2012)*

**2.** Plaintiff was told to make all of the trial period payments and his property would be modified back into his name and that any fraud committed towards the purported loan would be rectified, but when it came down to a permanent modification, defendants

drew up the permanent loan agreement into a non applicant non owner's name that required plaintiff (owner) to sign and notorize a Non Oral Agreement.

**COUNT 5**

**THEFT**

1. On April 20th, 2013, said property was broke into and vandalized. Plaintiff filed a police report and filed a claim with his Insurance Company QBE FIRST who paid a claims check of $1139.00 and forwarded the funds to defendant OCWEN who were the servicer of the loan at that time.

**2**. Defendant OCWEN cashed the check and never forwarded the funds to plaintiff but instead told plaintiff that they never were the servicers of plaintiff's loan and that the loan number from off of one of their Payment Statements does not show up in their system.

**3**. Plaintiff called the insurance company that handled the claim and asked for a copy of the check that was issued in which they provided.

**4**. Once plaintiff received the copy of the cashed check, plaintiff went to the address listed on the check only to find out that the address location was a Bank of America Building were defendant OCWEN was operating a call center wing of the building that was off limits to the public.

**5**. Plaintiff then took the check to a local Bank of America so that they could trace the funds.

**6**. The bank attendant called defendant OCWEN to inquire on defendant's check that was electronically cashed through their bank being that defendant has accounts there.

**7**. The bank attendant was told by defendant OCWEN that they never serviced the loan number associated with the check and that a request would have to be made through their research department.

**8**. The bank attendant made the request  to OCWEN's Research Department and faxed over the copy of the check along with a 2013 payment statement sent to plaintiff by OCWEN and Bank Attendant was told that such a request would take seven to ten days.

***note***: *plaintiff had already tried to go through defendant OCWEN's research dept. twice to no avail and had to wait 7 to 10 days on each occasion.*

**9**. After ten days, plaintiff went back to the bank and was provided with a copy of a loan history document from OCWEN showing that plaintiff's funds were transferred by defendant OCWEN to defendant ALLY BANK.

**note:** OCWEN had already claimed to have never serviced the loan

**10**. Plaintiff got ahold of then servicer CENLAR  who claimed to be the sub servicer of ALLY Bank and inquired about the funds and plaintiff was told by CENLAR that a property inspector would have to verify that the damage to the property had been repaired.

**11**. After the inspection was completed, plaintiff contacted CENLAR'S Insurance Claims Department and was told that the claim was rejected because there are no funds to be distributed.

For reasons stated above, defendant's engaged in RICO (wire fraud) in the theft of plaintiff's money and plaintiff is intitled to the full reimbursment of funds for the amount of $1139.00 plus damages.

## COUNT 6

## VICARIOUS LIABILITY/Fraudulent Tranfer

**1.** Defendant OCWEN became the servicer of the loan after purchasing the **servicing rights** from ALY/GMAC in 2012 (see Asset Purchase Agreement, ALLY/GMAC bankruptcy liquidation) and see OCWEN Consent Order that makes it clear that OCWEN is still subjected to the Consent Order whether or not a loan is serviced by their Sub Servicer or the servicing rights are sold to another servicer.

**2.** OCWEN now claim to have never serviced plaintiffs loan under its original loan number of 0602004677 after Changing the loan number to 0057564270 and fradulently had the new loan number sub serviced as a  ALLY Bank proprietary loan all the while knowing that the loan was already discharged in GMAC's Chapter 11 bankruptcy and was never assigned to OCWEN by GMAC during the Asset Purchase Agreement.

**3.** GMAC LLC discharged the debt in 2012 through their chapter 11 bankruptcy as bad debt owed to fannie mae and April Thomas discharged  the obligation under its **original loan number** in her chapter 7 bankruptcy to clear her credit profile around May of 2014 and by July of 2014, OCWEN fraudulently transfered the disolved loan to ALLY Bank under the false pretense that the loan was purchased by GMAC from The Home Loan

Network in 2008 and since April Thomas discharged the loan, the property reverted to ALLY Bank as the investor/lender of April Thomas's discharged obligation.

**NOTE:** The Home Loan Network is fraudulently on the deed of trust as the lender/beneficiary with MERS acting as their Nominee but, The Home Loan Network is a non bank non lender and had no beneficial interest for MERS to assign to GMAC June of 2012 which makes the assignment VOID.

**4.** In January of 2015, OCWEN recorded a fraudulent Corporate Assignment from GMAC to ALLY and used a fabricated Mortgage Note to allege a blank endorsement was made by GMAC in 2008 to be used as bearer paper to ALLY in the theft of plaintiff's home.

**5.** This fraudulent transfer was employed by OCWEN and CENLAR for the purpose of deceitfully creating a chain of title using the ALLY/GMAC name as the beneficiary to a loan that was both canceled, voided and discharged through both  GMAC in their chapter 11 and April Thomas's chapter 7 but OCWEN and ALLY are attempting to still plaintiff's property rights through a fraudulent foreclosure and plaintiff seeks damages and recourse.

**6.** GMAC could not have endorsed the Note in 2008 because GMAC's assignment from MERS acting as Nominee for the Home Loan Network did not occur until June of 2012 while GMAC was in bankruptcy, GMAC then discharged the purported loan as debt owed to fannie mae. OCWEN, ALLY and CENLAR have digitally re-produced the discharged Note from their electronic file and changed the loan number and have tried to enforce its terms and are now claiming to have held a foreclosure on a dead deed of trust. see UCC 3-407

(a) "Alteration" means (i) an unauthorized change in an <u>instrument</u> that purports to modify in any respect the obligation of a <u>party</u>, or (ii) an unauthorized addition of words or numbers or other change to an <u>incomplete instrument</u> relating to the obligation of a party.

(b) Except as provided in subsection (c), an alteration fraudulently made discharges a <u>party</u> whose obligation is affected by the alteration unless that party assents or is precluded from asserting the <u>alteration</u>. No other alteration discharges a party, and the <u>instrument</u> may be enforced according to its original terms.

**7.** GMAC had been dissolved for over three years before ALLY and OCWEN recorded their "Corporate Assignment" from GMAC with the intent to defraud plaintiff.

**COUNT 7:**

**VIOLATION OF A.R.S. 1522 UNLAWFUL PRACTICES**

In 1967, Arizona adopted its Consumer Fraud Act (the "Act") "to root out and eliminate 'unlawful practices' in merchant-consumer transactions."   People ex rel. Babbitt v. Green Acres Trust, 127 Ariz. 160, 164, 618 P.2d 1086, 1090 (Ct. App. 1980).

The Act defines an unlawful practice as:

The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged.

**1**. Defendants and each of them engaged in fraudulent schemes in the theft of plaintiff's property and has violated this act by knowing that their purported lien on plaintiff's property was procured by fraud which voided and nullified the contract (loan/deed of trust) but continued to enforce the terms of the contract.

**2**. Defendants and each of them acted under false pretenses, false promise, misrepresentation or concealment, suppression or omission of material fact to plaintiff's detriment by knowing that plaintiff had owned his home for twelve years before applying for a Cashout Refinance Loan for himself and not a purchase money loan for his daughter and instead of rectifying the situation, defendants aided and abetted the fraudulent  origination, appraisal fraud and such an act was in violation of ARS 1522  see **Madsen v. W. Am. Mortg. Co., 143 Ariz. 614, 618, 694 P.2d 1228, 1232 (Ct. App. 1985).**

**3**. Defendants and each of them knew that the purported loan was Modified to a lower rate through the treasury department's HAMP without borrowers consent but continued to enforce the terms of the purported loan at the original note rate under a ficticious loan number/account and that such an act was in violation of ARS 1522. and ARS 1532 see Consent Orders for OCWEN

**4**. Defendants and each of them knew or should have known that the unnotorized and undated Mortgage Note produced by them was void and illegally altered to validate chain of title for the purpose of giving the illusion that they had beneficial interest and

can foreclose on plaintiff's property and that such an act was in violation of ARS 1522 and 1532 see consent judgment orders for OCWEN and ALLY.

**5**. Defendants knew or should have known that the fabricatred and altered Note that was used to foreclose on plaintiff's property, has the Home Loan Network on the face of it but is endorsed by GMAC as Bearer Paper to ALLY Bank without first being endorsed in blank by the Home Loan Network as "Lender" was criminal and invalid and that such an act was in violation of ARS 1522 and 1532 and plaintiff demands damages see OCWEN Consent Order. see UCC 3-407 that says:

(a) "Alteration" means (i) an unauthorized change in an <u>instrument</u> that purports to modify in any respect the obligation of a <u>party,</u> or (ii) an unauthorized addition of words or numbers or other change to an <u>incomplete instrument</u> relating to the obligation of a party.

(b) Except as provided in subsection (c), an alteration **<u>fraudulently</u>** made discharges a <u>party</u> whose obligation is affected by the alteration unless that party assents or is precluded from asserting the <u>alteration</u>. No other alteration discharges a party, and the <u>instrument</u> may be enforced according to its original terms.

**6**. Defendants knew or should of known that plaintiff applied for a HAMP Modification as successor in interest (owner/title holder) and after making all trial period payments the final Mod. Agreement was deliberately put in non applicant non title owners name inorder to deceive plaintiff into making payments on a discharged debt and such an act violates ARS 1522.  **See Sellinger v. Freeway Mobile Home Sales, Inc., 110 Ariz. 573, 575-76, 521 P.2d 1119, 1121-22 (1974).**

**Private Causes of Action for Consumer Fraud.**

**Points and cases of authority**

The elements for consumer fraud are different from, and more easily shown than, the elements for common law fraud, which include intent to deceive, knowledge of the falsity, and the right to rely or reasonable reliance, and must be proven by clear and convincing evidence.  See Flagstaff Med. Ctr., Inc. v. Sullivan, 773 F. Supp. 1325, 1362 (D. Ariz. 1991); Kuehn v. Stanley, 208 Ariz. 124, 219, 91 P.3d 346, 351 (Ct. App. 2004); Cearley v. Wieser, 151 Ariz. 293, 295, 727 P.2d 346, 348 (Ct. App. 1986); Dunlap, 136 Ariz. at 343-44, 666 P.2d at 88-89; Parks v. Macro-Dynamics, Inc., 121 Ariz. 517, 520, 591 P.2d 1005, 1008 (Ct. App. 1979); Perry v. Hansen, 120 Ariz. 266, 269-70, 585 P.2d 574, 577-78 (Ct. App. 1978).  Consumer fraud has a lower standard than common law

fraud because the purpose of the Act "is to provide a remedy for injured consumers who need such protection to counteract the disproportionate bargaining power which is typically present in consumer transactions."  Dunlap, 136 Ariz. at 344, 666 P.2d at 89.

## COUNT 8: VIOLATION OF A.R.S. 33-420

**1.** Defendants ALLY Bank and OCWEN recorded a groundless Corporate Deed Assignment, Limited Power of Attorney and Substitution of Trustee while knowing that the assignments were invalid and that the Limited Power of Attorney was expired after GMAC became disolved/defunct in 2013 but did reference the expired document illegally to assign/transfer plaintiff's property to ALLY Bank three years after its expiration in violation of ARS 420 and plaintiff is demanding treble damages.

**2. D**efendants knew or should have known that GMAC/ResCap are a defunct, disolved Corporatation who did not rise from its ashes to Assign its "former" Parent Company ALLY Financial any interest in plaintiff's home three years after its death which thereby make ALLY Finanancial's Recorded Corporate Assignment a fraud that is in violation of ARS 420. and ARS 44-1522 and 1532

**3.** Plaintiff had already owned his home since 1996 and the fraudulent recorded deed of trust that show my daughter April Thomas as Borrower and the Home Loan Network as "lender" is a falsity because the Home Loan Network is a non bank/lender and where only in the capacity of a broker which violates ARS 420 which plaintiff is demanding treble damages.

**4.** All Defendants had full knowledge that plaintiff did not sell his property to his daughter April and the Home Loan Network did not lend her money for the purchase of plaintiff's property and all defendants  knew that MERS acting as Nominee for the Home Loan Network could not Assign any interest to GMAC in 2012 because no money was loaned by the Home Loan Network but each defendant failed to investigate the fraud but only aid and abet the fraudulent recorded document (vicarious liability) in violation of ARS 420.

**5**. Plaintiff is demanding treble damages for each of defendant's groundless recordings and for the loss of his property and plaintiff is also demanding Attorney's fees per ARS 33-420(C).

## COUNT 9

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Defendants and each of them vicariously contributed to plaintiff's emotional and physical distress that has caused plaintiff to suffer from from high blood pressure/anxiety/ hypertention that lead to an aeorta disection in October of 2012, hospitalization, insomnia, poor work performance, lost wages and loss of consortium and sex drive due to medications taken to control high blood pressure due to being subjected to defendant's abusive, fraudulent conduct in ther servicing practices. *See Johnstone v. Bank of America, 173 F. Supp. 2d 809, 814-16 (N.D. Ill. 2001) (actual damages may include emotional distress); Ploog v. HomeSide Lending, Inc., 209 F. Supp. 2d 863, 870 (N.D. Ill. 2002) (following Johnstone).*

**COUNT 10**

**QUIET TITLE**

**Request for relief**

12-1252. Title of plaintiff;  proof

A. The plaintiff must recover on the strength of his own title.

**This Court has proper Jurisdiction and Venue**

Plaintiff seeks quiet title to his property due to ALLY Bank has never loan plaintiff money towards the purchase of his home but is unlawfully claiming an ownership interest by the use of fraudulent documents purporting to create a chain of title for the theft of  plaintiffs property. All named Defendants contributed to ruining the chain of title by recording fraudulent assignments that represent a fraudulent altered mortgage Note to a fraudulent loan number. Plaintiff has been the owner of the property since 1996 and in 2008 plaintiff's property was fraudulently put into daughters name through a fraudulent conveyance by recording a deed of trust that shows daughter April Thomas as the trustor and a non bank (the Home Loan Network) as Lender but does not show plaintiff as "seller" that conveyed his interest in the property.  (see plaintiffs Recorded deed of release and reconveyance and see Recorded Deed of Trust that conveyed nothing from plaintiff as "SELLER"  of property; **Lot One Hundred Sixty Two (162), RAINTREE GARDENS UNIT FOUR AMENDED, according to Book 285 of Maps, page 42, records of Maricopa County.  see UCC 3-407**

**POINTS OF AUTHORITY**

Hoagland Appleton Qualifed Pers Residence Trust v Emmet County Rd Comm'n, 236Mich App 546, 600 NW2d 698 (1999).  If plaintiff fails to make a prima facie case of title, judgment may be entered for defendant. Ray v Bentley, 39 Mich App 578, 197 NW2d 827 (1972). Once plaintiff makes a prima facie case, the defendant(s) must prove a superior right or title. Beaulah Hoagland, supra. The court reviews "the whole situation and grants or withholds relief as good conscience dictates." Republic Bank v Modular One LLC, 232 Mich App 444, 591 NW2d 335 (1998), overruled on other grounds by Stokes v Millen Roofing Co, 466 Mich 660, 649 NW2d 371 (2002).

In general, an enforceable contract requires three basic elements: 1) an offer, 2) acceptance, and 3) consideration. Without detailing each component too much, the first two elements are often combined into one affair: mutual consent. "It is elementary that before there can be a binding contract there must be mutual consent of the parties to the terms thereof." Heywood v. Ziol, 91 Ariz. 309, 372 P.2d 200 (1962); *see* Denbo v. Badger, 18 Ariz. App. 426, 427–28, 503 P.2d 384, 385–86 (Ct. App. 1972) (holding that specific performance was not available to a prospective buyer of real property because there was no mutual consent between the buyer and seller).

---

**COUNT 12**

**UNJUST ENRICHMENT**

Defendants were not the owners of plaintiff's property and has used fraudulent documents to create a chain of title for the purpose of stilling plaintiff's property through an unauthorized foreclosure through the use of fraudulent documents and groundless recorded instruments. see counts 1-13 and see UCC 3-407(b) that says

(b) Except as provided in subsection (c), an alteration **fraudulently** made discharges a party whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration. No other alteration discharges a party, and the instrument may be enforced according to its original terms.

**COUNT 13**

**VIOLATIONS OF R.I.C.O.**

**1**. Defendants violated the Rico Act in the theft of plaintiff's property by employing mail

fraud, wire fraud, corruption and deception in the collusion with each other in the attempted theft of plaintiff's property using a fraudulent loan account number that represents a fraudulent Mortgage Note used to foreclose on plaintiff's home and to validate their unlawful UD action that violates  18 U.S.C. § 1341 see *Holmes v. Securities Investor Protection Corp.  and  Beck v. Prupis, 529 U.S. 494 (2000),*

**COUNT 14**

***VIOLATIONS OF THE HOME OWNERS BILL OF RIGHTS Act of 2014 and THE NEW SERVICIING RULES***

**Dodd-Frank Wall Street Reform and Consumer Protection Act**

**the Real Estate Settlement Procedures Act of 1974, 12 CFR 1024.41 - Loss mitigation procedures**

## Definitions:

### <u>Borrower also applies to "successors in interest"</u> see New Servicing Rules

Civil Penalty

In general

(1)

Any servicer who violates a provision of this section shall be subject to a fine in an amount, as determined by the Bureau, not to exceed $5,000 for each violation except that the maximum penalty for all violations by any particular servicer during any 1-year period shall not exceed $1,000,000.

(2)

Liability to borrower

Any servicer that violates a provision of this section with respect to a loan shall be liable to the borrower of such loan in the amount of $15,000 per violation.

(3)

Continuing violations

In the case of a continuing violation, as determined by the Bureau, each day shall constitute a separate violation for purposes of this subsection.

6A.

Servicer treatment of borrowers

The Defendants have continuing violations of the following sections of the act and plaintiff is demanding redress at a per diem rate to be calculated by this Court or the proper forum

## Count a.

Servicer treatment of borrowers

Defendants failed to honor plaintiff's verfied successor in interest status and deliberately processed plaintiff's trial period payments towards a fraudulent loan account and processed the permanent modification in non applicant non owners name.

Servicer requirements

## Count b.

Defendants have failed to maintain a Single electronic record and single point of contact after verification (recorded deed of trust) that plaintiff was the successor in interest and continued to demand a third party authorization .

## Count c

Defendants have failed to provide  information for a free and publicly accessible website where borrowers may check their estimated net present value

## Count d.

Defendants failed to provide Availability of net present value information

## Count e.

Borrowers facing imminent default

Defendants failed to assist and evaluate plaintiff for an affordable loan modification while plaintiff was facing imminent default (as such term is defined by the Bureau)

## Count f.

Defendants failed to Assist plaintiff while applying for a affordable loan modification and gave plaintiff the run around even after receiving a recorded deed showing plaintiff as the owner of the property since 2011.

## Count g.

Defendants failed to have available sufficient staff to answer questions borrowers may have about filling out documents.

## Count h

Defendants failed to provide borrower a list of non-profit legal services organizations and housing agencies approved by the Department of Housing and Urban Development, that can assist the borrowers with documents.

## Count i.

Treatment of successors in interest

Defendants failed to honor plaintiff as successor in interest after receiving the requested proof (recorded deed of trust) and failed to provide full information and complete loss mitigation options to successor homeowner protected from an acceleration of a mortgage loan under the Garn-St Germain Depository Institutions Act of 1982

## Count j

Defendants failed to review plaintiff's mortgage loan for loss mitigation, as though the successor homeowner was the **borrower**, and provide a decision on available loss mitigation prior to an assumption of the mortgage loan, as requested by the succeeding homeowner.

## Count k

After reviewing application

Defendants never sent plaintiff a denial letter and failed to notify the plaintiff of other loss mitigation options that may be available to the borrower and did not consider the borrower for such other loss mitigation options because plaintiff refused to sign as a witness to a permanent modification for a non applicant non property owner.

Requirements related to transfer of loans

In general

For any transfer of servicing to a successor servicer of a federally related mortgage loan or subservicer, the transferring servicer shall—

## Count l

Defendants failed to inform the successor servicer (including a subservicer) whether a loan modification request is pending;

## Count m

Defendants failed to provide the successor servicer with all documentation related to the mortgage loan, including any documentation relating to a loan modification or loss mitigation process;

## Count n

Defendants failed to ensure that the successor servicer has the operational capacity to manage the transferred loan; (single point of contact)

## Count o

Defendants failed to ensure that the successor servicer shall accept and continue processing prior loan modification requests, by including such requirement in the agreement made between the servicers when transferring the loan;

## Count p

Defendants failed to ensure that successor servicer shall honor trial and **permanent loan** modification agreements entered into by the transferring servicer by including such requirement in the agreement made between the servicers when transferring the loan but continued to enforce unmodified terms under a differant loan number.

## Count q

Defendants failed to notify the borrower of the transferred loan that the new servicer is required to accept and continue processing prior loan modification requests, and failed to honor trial and permanent loan modification agreements entered into by the transferring servicer.

## Count r

Defendants failed to Honor an existing loan modifications and an application in process per New Servicing Guidelines

## Count s

The successor servicer failed to agree to honor and accept any existing loan modification and continue any loan modification applications.

## Count t

Prohibition on foreclosure

Defendants initiated a foreclosure During the 60-day period beginning on the effective date of transfer of the servicing of a federally related mortgage loan.

Subsequent applications for affordable loan modification

## Count u

Defendants failed to allow such borrower to make a subsequent affordable loan modification application to the borrower after borrower experienced a material change in

circumstances, as defined by the Bureau.

Stop of sales pending application

## Count v

Defendants failed to stop and cancel the foreclosure sale after a borrower submited an initial application for a affordable loan modification assistance more than 7 business days before a scheduled foreclosure sale.

Initiation of foreclosure

## Count w

Defendants initiated and continue a nonjudicial foreclosure under State law against a mortgagor that submitted an initial application for an affordable loan modification or other loss mitigation without determining whether the mortgagor is eligible for an affordable loan modification; and did not make such a modification while the mortgagor was eligible for a modification.

## Count x

Defendants failed to determines that the borrower is not eligible for a modification as the current successor in interest owner of the property since 2011but delberately processed permanent modification in non applicant non borrowers name and claims to have held a foreclosure in that parties name.

Defendants failed to notify the borrower of the determination under clause (i); and failed to provide plaintiff with an unforged, undoctored and unaltered

## Count y

Defendants failed to provide a copy of an unaltered note and a,deed of trust showing the **true lender** and not the **bailor** (the Home loan Network),or other document necessary to establish the right of the servicer to foreclose on the mortgage, including proof of **valid** assignments of the mortgage to the servicer and the right of the servicer to enforce a **valid** note under the laws of **Arizona** in which the real property securing the mortgage is located;

Defendants failed to provide a copy of any language in the pooling or servicing agreement with respect to the mortgage that the servicer relies upon in asserting that it is prohibited or limited in providing a modification of the mortgage note for successors in interest.;

Defendants failed to provide a copy of all correspondence between the servicer and the borrowers and investors in which the servicer attempts to obtain permission to make a modification for a successor in interest; and

Defendants failed to provide the alternatives to foreclosure available to the borrower,

including plaintiff's deed in lieu of foreclosures and short sales

Plaintiff did not decline to be considered for a loan modification in writing or decline an affordable modification in writing; and did respond to the servicer's outreach activities (as defined by the Bureau) and had twice completed an application and did not fail to make a trial or permanent loan modification payment.

Bar to foreclosure

## Count z

Defendants Failure to comply with the requirements of this subsection shall be a bar to the foreclosure of a mortgage, deed of trust, or substantially similar instrument.but ALLY Bank claims to have held a foreclosure on January 19, 2016 and a UD action therefore after.

## Count z(1)

Waiver of late fees

Plaintiff's application for an affordable loan modification assistance was accepted, but defendants failed to waive any foreclosure fees and any late fees related to the delinquency in payment.after all amounts associated with default was discharged in chapter 7 bankruptcy before ALLY Bank alleged to aquire loan..

## Count z(2)

Defendants continued to allow accrual of additional late or foreclosure fees during the period beginning on the date that the borrower submited an affordable loan modification application and the date on which the servicer makes a determination on such application..

## Count z(3)

Defendants failed to notify plaintiff in writing that a foreclosure sale was postponed and failed to notify borrower in writing that a sale was rescheduled.

## Count z(4)

Certification of determination of eligibility required for sale

Sale of property prohibited

Defendants failed to file a certification with the appropriate land records office in the jurisdiction where the property securing the mortgage is located, stating that the servicer has determined the eligibility of the successor in interest for an affordable loan modification in compliance with this section—

## Count z(5)

Defendants illegally sold the property securing the mortgage to themselves without determining the eligibility of successor in interest borrower and without being the true beneficiary

## Count z(6)

Defendants purchased the property securing the mortgage through a mock auction and initiated an action to recover possession of the property.

Violations

## Count z(7)

Defendants sold plaintiff's property in violation of this paragraph and failed to void the sale.

## Count z(8)

Initial application defined

Defendants failed to honor plaintiff's complete initial application which consisted of a Uniform Borrower Assistance Form 710 of the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, a Request for Modification and Affidavit of the Making Home Affordable Program, or other equivalent form that sets forth the borrower's financial, income, and hardship information and Form 4506–T of the Internal Revenue Service.

Earned principal forgiveness

In general

## Count z(9)

Defendants failed to reduce the mortgage note principal under earned principal forgiveness provided in subparagraph (B), and did not target a affordable regular mortgage payment and did not comply with the affordable loan modification plan waterfall steps as set out by the Bureau of interest rate reduction, term extension, and principal forbearance, as necessary to achieve a target affordable regular mortgage payment and failed to calculate net present value approved by the bureau.

## Count z(10)

Principal reduction required

Defendants failed to offer a borrower an affordable loan modification having the maximum amount of principal reduction that results in a positive net present value

38

calculation. For purposes of calculating net present value, and used their own formula, not approved by the Bureau.

## Count z(11)

Principal forgiveness

Treatment of principal reduction amount

Defendants failed to disclose that the purported loan had already been modified in 2013 through unclean hands without plaintiff's signature or knowlege. Defendants then changed the loan number and enforced the loan as an unmodified loan.

## Count z(12)

Bar to foreclosure

Defendants violated the provision of this section by conducting a non-judicial foreclosure on a federally related loan without being the beneficiary of the deed of trust.after .

## Count z(13)

Penalties for robo-signing

Defendants have recorded more than one document in the state of Arizona's land records office containing material deficiencies with respect to plaintiff's mortgage loan and plaintiff is demanding statutory damages for each violation.


## DEMANDS

**Plaintiff is demanding Damages as follows and prays for relief:**

**Each defendant failed to send the required change of servicer/owner notice as required under USC 2605 (E)(1)(b) and showed a pattern or practice of noncompliance and plaintiff is demanding statutory damages for the amount of $60,000.00 dollars and actual damages for the loss of property at $94100.00 plus Attorney fees. Plaintiff is also demanding punitive damages.**

**Cenlar failed to respond to plaintiff's Qualified Written Request per USC 2605(e)(4) plaintiff is demanding damages under that section in the amount of $2000 and actual damages of $94100 for not providing the name, telephone number and address of the alleged owner of note as requested by plaintiff.**

**Each defendant failed to investigate and respond to the fraudulent origination of the**

loan and make any corrections to the loan in violation 12 USC 2605(e)(1)(A) and plaintiff is demanding statutory damages for the amount of $60,000.00 and actual damages for the loss of his property amounting to $94100.00 plus Attorney Fees and punitive damages.

Each defendant knowingly failed to apply payments to the right account in violation of USC 2605(f) *Holland v GMAC Mortgage Corp. 2206 WL 1133224 (D. Kan. April 26, 2006) and* Hutchinson v. Delaware Savings Bank, 410 F. Supp. 2d 374 (D.N.J. 2006) and Rawlings v. Dovenmuehle Mortgage, Inc., 64 F. Supp. 2d 1156, 1166-67 (M.D. Ala. 1999). plaintiff is demanding damages  of $60,000 and attorney fees plus punitive damages.

Plaintiff is seeking damages in the amount of thirty five million dollars for personal injury attributed to by defendants negligent infliction of emotional distress that lead to plaintiff suffering from high blood pressure/anxiety/ hypertention that progressed into an aeorta disection, hospitalization, insomnia, poor work performance, lost wages (economic loss) and loss of consortium and sex drive due to medication taken to control high blood pressure.

ALL Defendants have used every fraudulent scheme to cover up the fact that ALLY Bank did not own the loan and did not loan plaintiff or his daughter money towards the aquisition of his property. All Defendants have put plaintiff through hell and back while plaintiff just wanted to keep a roof over his families head and borrow money from his own equity without having to deal with defendants greed and unfair business practices and total disregard for following established law.

Plaintiff is demanding damages to be calculated by this court or the right forum (Ambudsman) for all defendants deliberate, calculated and continuous violations of the NATIONAL HOMEOWNERS BILL OF RIGHTS ACT OF 2014 (H.R. 4963) and for defendants continuous violations in their failing to follow guidelines that are in place for Loan Modification Request for Successor in interest (title holder) as required by federal law.

Plaintiff is demanding damages under ARS 420 for all defendant's filings of groundless and meritless documents.

Plaintiff is asking for a declatory judgment for Quiet Title to clear title of clouds and defects by the unclean hands of MERS, OCWEN, GMAC/ALLY Bank and the Home Loan Network.

Plaintiff also seeks to recover the amount of one thousand one hundred dollars that was  stolen by defendants  from plaintiff's property damage claim check that was never paid to plaintiff by defendants OCWEN and ALLY Bank and any other amounts that this court finds Just and proper.

**Jury Trial requested**

Kevin E. Thomas

8/29/2016